IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Julian Mihaita, d/b/a     :
JDM Industrial Painting, a/k/a   :
JDM Industrial and Commercial  :
Painting,          :
       Petitioners  :
             :
    v.       : No. 1264 C.D. 2019
             : Submitted: May 11, 2020
Department of Labor and Industry,  :
Office of Unemployment Compensation :
Tax Services,        :
       Respondent :

BEFORE:  HONORABLE PATRICIA A. McCULLOUGH, Judge
       HONORABLE ANNE E. COVEY, Judge
       HONORABLE J. ANDREW CROMPTON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CROMPTON       FILED: June 26, 2020

    Sole proprietor Julian Mihaita (Employer), previously doing business as JDM Industrial Painting (JDM), petitions for review from the Department of Labor & Industry (Department) order allowing the Office of Unemployment Compensation Tax Services' (OUCTS) assessment of unemployment compensation (UC) taxes due for 2013 (Assessment). Employer argues the Assessment is invalid because 2013 was outside the audit notice and based on arbitrary figures. He also challenges the Assessment on due process grounds, contesting its enforcement under the four-year look back period in Section 309.2 of the UC Law,[1] and equitable estoppel principles. Upon review, we reverse.

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, added by the Act of April 22, 1949, P.L. 727, 43 P.S. §789.2.

# I. Background

Until its closure in 2017,[2] Employer owned and operated JDM, a painting company engaged in commercial and industrial construction. From the first quarter of 2013 through the third quarter of 2017, Employer did not remit UC contributions on his painters' wages since he deemed them independent contractors.

In June 2017, OUCTS notified Employer he was selected for an audit: "**From January 1st 2013 through December 31st 2016. All documents for years 2013, 2014, 2015, AND 2016 must be available at the time of the audit.**" Reproduced Record (R.R.) at 26a (bold in original). Since the notice scheduled the audit for July, and Employer requested time to prepare, the audit was postponed.

Then, in September 2017, after the previously assigned tax agent left her job, OUCTS sent a new letter stating a different audit period and naming a different tax agent than the prior notice (Audit Notice). *See* Agency Dec., 8/9/19, Finding of Fact (F.F.) No. 5. Significantly, the Audit Notice eliminated 2013 from the scope of audit, set forth as "01/01/2014 through 9/30/17," but stating, "**Please have all records available for the period of 01/01/2013 through 09/30/2017.**" R.R. at 27a (bold in original, underline added). It noted "the examination period may be expanded if material discrepancies or non-compliance are discovered." *Id*. Enclosures included a pamphlet titled "Preparing for Your UC Audit" (Pamphlet) explaining the audit process, a list of records required to be kept under UC Regulation 63.64, 34 Pa. Code §63.64 (relating to employee and wage records), and a list of records to be examined. Certified Record (C.R.), Item No. 14 (Ex. P8).

___
[2] Employer closed JDM before the third quarter of 2017.

2

Subsequently, the assigned tax agent (Tax Agent) conducted the audit on November 2, 2017 (Audit), at the office of Employer's accountant (Accountant). Although Employer had most of the relevant records listed in the Audit Notice, Accountant did not have records of cash disbursements to workers for tax year (TY) 2013, which was not within the scope of audit. Relevant here, Tax Agent expanded the scope of audit beyond that stated in the Audit Notice to include TY 2013.

Because Employer paid painters by check, at the Audit, Tax Agent sought records of cash disbursements to show the wages paid in addition to "bank statements available for 2013." F.F. No. 18. Since TY 2013 was "almost outside the statute of limitations [in Section 309.2 of the UC Law], [Tax Agent] advised the records for 2013 would be needed by the end of 2017." F.F. No. 21 (emphasis added). Also, despite that the Pamphlet assures that audit findings would be shared the date of the Audit, Tax Agent "did not discuss any proposed findings, nor give [Accountant] a summary of the proposed audit adjustments prior to leaving the [A]udit." Agency Dec., 8/9/19, at 24. Contrary to agency practice, Tax Agent did not explain her findings before leaving the Audit because she "did not have all the information she needed to arrive at any findings on that date." F.F. No. 22.

Five weeks later, Tax Agent sought additional records. In a series of emails exchanged on December 14, 2017, Employer sent the requested information. F.F. Nos. 24-28. One email had an attachment, "2013-MIHAITA.xlsx" showing 2013 transactions (12-14 Email). F.F. Nos. 36-37. Tax Agent did not reply until December 27, 2017, acknowledging "The spreadsheet had the 2013 transactions, but I do not see the 2017 transactions." C.R., Item No. 6 (12-27 Email); F.F. No. 39.

3

Nevertheless, without utilizing actual wage records, on **December 26, 2017**, OUCTS issued the Assessment totaling **$118,933.19** for 2013[3] based on its conclusion that Employer misclassified 43 painters as independent contractors. Using the estimate of $825,000 as gross wages for 2013, OUCTS determined the UC tax liability as follows: 1st quarter ($125,000 gross wages), $12,830.88 in UC contributions, plus $5,380.44 interest; 2nd quarter ($250,000 gross wages), $25,661.75 in UC contributions, plus $10,200.38 interest; 3rd quarter ($250,000 gross wages), $25,661.75 in UC contributions, plus $9,623.00 interest; and 4th quarter ($200,000 gross wages), $20,529.40 in UC contributions, plus $7,236.59 interest. F.F. No. 34; R.R. at 21a. It also imposed penalties of $450.00 per quarter. The Assessment contained the following notice: "**THIS ASSESSMENT WILL BECOME CONCLUSIVE AND BINDING UNLESS YOU FILE A TIMELY PETITION FOR REASSESSMENT.**" R.R. at 16a (bold and uppercase in original).

On January 10, 2018, Employer filed a petition for reassessment asking to dismiss the Assessment because it significantly over-inflated his UC tax liability despite his submission of actual wage records for 2013 before the end of the year as requested. He emphasized the gross wages OUCTS used to calculate the Assessment, *i.e.*, $825,000, was "not rational" when the 2013 records reviewed at the Audit showed total bank deposits were $594,436.84, and gross receipts were $578,185. R.R. at 19a. He asserted this vast discrepancy rendered the Assessment invalid and sought to estop OUCTS from enforcing it.

---

[3] Although the Audit covered 2014 through the third quarter of 2017, as well as 2013, Employer only contested the Assessment for 2013. Relevant here, he did not dispute the UC tax liability for 2014 ($13,902.46), 2015 ($19,552.99), 2016 ($21,515.22), or 2017 ($330.11). *See* Certified Record (C.R.), Item No. 18, Hr'g Tr., 11/20/18, Notes of Testimony (N.T.) at 56. Notably, Employer did not challenge the classification of his painters as employees.

***After*** Employer filed his petition for reassessment challenging the validity of the Assessment, OUCTS issued its audit findings, including TY 2013 (Exit Letter). F.F. No. 47. The Exit Letter stated the adjusted tax liability for 2013 based on actual wages was **$31,375.15**. In February 2018, Tax Agent's supervisor sent another letter advising OUCTS recalculated Employer's UC tax liability using actual wages and would issue a new assessment. F.F. Nos. 50-52. However, this recalculation letter was issued after the four-year statutory limitations period expired.

A year after the Audit,[4] the Tax Review Office conducted a hearing. Tax Agent testified on behalf of OUCTS, and Accountant testified for Employer. Much of the testimony focused on the delay in Tax Agent's delayed receipt of the 12-14 Email almost two weeks later. Tax Agent could "not explain the gap." C.R., Item No. 18, Hr'g Tr., 11/20/18, Notes of Testimony (N.T.) at 49.[5] Tax Agent also could not account for the discrepancy in UC tax liability between TY 2013 of **$84,684,** and the other years in the Audit, ranging from **$13,902.46** in TY 2014 to **$21,515.22** in TY 2016. Counsel admitted the Assessment was "inflated" with "much higher numbers than 2014 or the other years of the assessment." N.T. at 51. She justified this approach as a "fair practice," stating "you are up against the end of the calendar year and you have one shot at issuing an assessment for the amount of that year and you don't have the data you need at that moment in time …." *Id.* (emphasis added). Tax Agent offered no basis for selecting $825,000 as gross wages and calculating the Assessment with overly-inflated figures. N.T. at 50, 58.

---

[4] During this time, OUCTS attempted to settle the matter with Employer, who had filed a petition for personal bankruptcy. *See* C.R., Item No. 23 (OUCTS Post-Hr'g Br. at 1 n.1).

[5] On cross-examination, Tax Agent replied: "My testimony is that I did not receive that [12-14 Email] in its entirety until December 26, 2017 at 8:55 p.m." N.T. at 62 (emphasis added).

5

Based on the record and post-hearing briefs, in August 2019, the Department granted Employer's petition for reassessment in part, and denied it in part. C.R., Item No. 24; Pet. for Review, Ex. A. It granted the petition to the extent it challenged the amount due for 2013, and directed recalculation of Employer's UC tax liability based on the actual figures. However, after concluding the Assessment was timely under Section 309.2 of the UC Law, 43 P.S. §789.2, the Department declined to void the Assessment despite its calculation from inflated figures. It reasoned OUCTS was permitted to use estimates for the Assessment under Section 304 of the UC Law, 43 P.S. §784.

The Department found Tax Agent had the information she needed to make audit findings in December 2017. F.F. No. 40. It found that while bank statements for 2013 were available during the Audit, the records did not indicate recipients of cash disbursements. F.F. No. 19. Accountant prepared spreadsheets for TY 2014-16 in the scope of audit, but not for 2013 as Tax Agent only expanded the scope to include 2013 during the Audit. *See* Agency Dec. at 19 ("Because [Employer] had not provided the same type of information for 2013, [Tax Agent] asked [Accountant] during the [Audit] to complete the same type of spreadsheets for 2013 and 2017 that [Accountant] provided for 2014 through 2016."); F.F. No. 17.

Notably, the Department found Employer sent 2013 records with the 12-14 Email. F.F. No. 37. However, it also credited Tax Agent's testimony about her delayed receipt, confirming there was "no evidence … to explain why there was a delay in the delivery of the [12-14 Email] resulting in [Tax Agent's] receipt of it on December 26, 2017." Agency Dec. at 20. Without resolving this evidentiary conflict, the Department deemed the date of receipt the more important date.

6

Notwithstanding that the Assessment was overinflated at $100,000 more than Employer's liability for TY 2014, the Department declined to dismiss it, allowing its recalculation using 2013 figures. It explained the reassessment process adequately protected Employer from the overinflation here.

Employer petitioned this Court to review the Department's order.

## II. Discussion

On appeal,[6] Employer argues the Assessment was arbitrary because OUCTS disregarded actual wage records and admittedly inflated the figures such that they lacked any foundation. Employer also challenges the Audit as lacking due process because he received conflicting notices regarding the audit scope and the Audit Notice stated the audit period started in 2014. In addition, he contends the Department lacks authority to recalculate the Assessment using actual figures and issue a corrected assessment when the four-year limitations period in Section 309.2 of the UC Law, 43 P.S. §789.2, expired at the end of 2017.

The Department counters that the Assessment is within its authority and is enforceable when recalculated using actual wages. It also asserted that since it instituted the Assessment before the end of 2017, it did not matter that it did not recalculate the correct amount owed until after the four-year look back period.

---

[6] Our review is limited to determining whether the necessary findings of fact are supported by substantial evidence, whether the Department committed an error of law, or whether petitioner's constitutional rights have been violated. *Best Courier v. Dep't of Labor & Indus.*, 220 A.3d 696 (Pa. Cmwlth. 2019). An agency commits reversible error when its statutory construction is not supportable or its actions are not in accordance with law, including the practice and procedure of that agency. Section 704 of the Administrative Agency Law (AAL), 2 Pa. C.S. §704.

## A. Statutory Authority

In partially granting the reassessment petition, the Department recognized the Assessment of **$118,933.19** was based on inflated figures. Because the Department declined to void the Assessment based on over inflation, we review the statutory grounds Employer cites for its invalidity: Section 304 of the UC Law, 43 P.S. §784 (relating to the Department's assessment of UC contributions due based on wages employer paid); and Section 309.2 of the UC Law, 43 P.S. §789.2, (relating to collection of UC taxes owed).

We construe the meaning of these statutory provisions pursuant to the principles set forth in the Statutory Construction Act of 1972, 1 Pa. C.S. §§1501-1991. "Statutory language 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Com. v. Giulian*, 141 A.3d 1262, 1269 (Pa. 2016) (citation omitted).

When an agency has enforcement authority under a statute, a court may defer to its interpretation, unless its construction is clearly erroneous. *Summit Sch., Inc. v. Dep't of Educ.*, 108 A.3d 192 (Pa. Cmwlth. 2015). However, we do not afford deference to an agency's interpretation when it is not in accordance with law or is "purely arbitrary." *Slawek v. State Bd. of Med. Educ. & Licensure*, 586 A.2d 362, 366 (Pa. 1991). In such cases, particularly when an agency seems to adopt an interpretation for purposes of litigation, its construction is not entitled to *any* deference. *ARIPPA v. Pa. Pub. Util. Comm'n*, 792 A.2d 636 (Pa. Cmwlth. 2002) (*en banc*).

8

## 1. Assessment under Section 304

The source of OUCTS' assessment authority is Section 304 of the UC Law, 43 P.S. §784. Entitled "Reports by employers; assessments," it provides:

> Each employer shall file with the [D]epartment such reports, at such times, and containing such information, as the [D]epartment shall require, for the purpose of ascertaining and paying the contributions required by this act.
>
> (a)(1) If any employer fails within the time prescribed by the [D]epartment to file any report necessary to enable the [D]epartment to determine the amount of any contribution owing by such employer, the [D]epartment may make an assessment of contributions against such employer of such amount of contributions for which the [D]epartment believes such employer to be liable, together with interest thereon as provided in this act.
>
> (2) Within fifteen days after making such assessment the [D]epartment shall give notice thereof to such employer as provided in paragraph (3). If such employer is dissatisfied with the assessment so made he may petition the [D]epartment for a re-assessment in the manner hereinafter prescribed.
>
> (3) The [D]epartment will mail notice of an assessment to the employer's last known address or electronically transmit notice of an assessment to the employer's electronic mail address, if the employer has designated such an address. Notice of an assessment by mail is complete upon mailing. Notice of an assessment by electronic transmission is complete when notice is sent to the employer's electronic mail address.
>
> (4) In any petition for re-assessment filed hereunder and in any further appeal taken thereafter as herein provided, no questions shall be raised with respect to the [D]epartment's determination of the Adjustment Factor applicable to any year covered by the assessment.
>
> (b) Any employer against whom an assessment is made may, within fifteen days after notice thereof, petition the [D]epartment for a re-assessment which petition shall be under oath and shall set forth therein specifically and in detail the grounds and reasons

9

upon which it is claimed that the assessment is erroneous. Hearing or hearings on said petition shall be held by the [D]epartment at such places and at such times as may be determined by rules and regulations of the [D]epartment and due notice of the time and place of such hearing given to such petitioner.

43 P.S. §784 (emphasis added). There is no dispute Employer did not file the quarterly reports contemplated in Section 304(a) as the basis of an assessment.

The material language under review is: "[T]he [D]epartment may make an assessment of contributions against such employer of such amount of contributions for which the [D]epartment believes such employer to be liable ...." *Id.* (emphasis added). After recounting the dictionary definition of "believes" in its decision, the Department reasoned the statute thus contemplates the need for estimating tax liability. It concluded "the statute authorizes the issuance of the assessment in the absence of the very information 'necessary to enable the [D]epartment to determine the amount of any contribution owing'… that is in the absence of the information required to make the assessment completely accurate." Agency Dec. at 22 (emphasis added).

Although we agree with its reasoning that OUCTS has the authority to estimate tax liability pursuant to Section 304 of the UC Law, particularly in the absence of information, we disagree with the Department's conclusion that OUCTS had the authority to issue the Assessment under review.

Section 304 contains the constraint on agency authority tying any assessment to an amount OUCTS *believed* due and owing. That belief was not present here. At no point during her testimony did Tax Agent indicate a belief that Employer owed UC taxes for TY 2013 ($84,684), of almost four times the taxes

10

owed for TY 2016 ($21,515) or more than six times the taxes owed for TY 2014 ($13,902). Indeed, the Department found that the Assessment was overinflated, and admits to using "inflated figures" on appeal. *See* Resp't's Br. at 13.

Further, such a belief was unfounded when the gross wage figure Tax Agent used for the Assessment was not connected to the 2013 records reviewed at the Audit or to the 2014 through 2016 records.

Agencies are creatures of statute that possess power only to the extent authorized by their enabling legislation. *Dep't of Transp. v. Beam,* 788 A.2d 357 (Pa. 2002). Although generally such authority is expressly conferred, "an administrative agency is invested with the implied authority necessary to the effectuation of its express mandates." *Our Lady of Victory Catholic Church v. Dep't of Human Servs.*, 153 A.3d 1124, 1129-30 (Pa. Cmwlth. 2016); *see Dep't of Envtl. Res. v. Butler Cty. Mushroom Farm*, 454 A.2d 1, 4-8 (Pa. 1982) (agency had "the power ... to issue the necessary instructions ... to correct violations of this act or regulations"); *Appeal of Culp*, 522 A.2d 1176, 1178-79 (Pa. Cmwlth. 1987) (agency "shall make and enforce such rules and regulations ... as may be necessary for the promotion and preservation of the public health"). However, an agency is unauthorized to act outside its statutory purpose. *See Aetna Cas. & Sur. Co. v. Ins. Dep't*, 638 A.2d 194 (Pa. 1994) (statutory provision for examining/reporting on insurer practices does not authorize agency to bar practices of insurers that are not prohibited by law).

OUCTS' statutory authority to issue an assessment is tethered to achieving the purpose of the statute, collection of UC taxes due. The Department,

through OUCTS, has regulatory and enforcement authority under the UC Law.[7]   An assessment may be based on either quarterly reports, which Employer did not file, or wage records kept and reviewed, which were not all available during the Audit.  But the basic principle underlying assessment remains, "after all what is being accomplished is the recovery of a just debt owed the sovereign." *Cedarbrook Realty, Inc. v. Nahill*, 399 A.2d 374, 378 (Pa. 1979).

The Department contends the Assessment was proper because it has the authority to base an assessment on estimates when actual wage records are not available.  But this characterization of the circumstances here is inaccurate.  In the abstract, we agree that using estimates to determine tax liability is necessary to effective tax enforcement, particularly when records are not available.  In this case, it was not clear that relevant records were unavailable;[8] Employer sent 2013 records in December 2017, 12 days before OUCTS issued the Assessment, and Tax Agent had bank statements and tax filings for 2013, as well as actual wage records and spreadsheets for 2014 to 2016.

---

[7] UC regulations, 34 Pa. Code §63.52 (Quarterly reports from employers) and 34 Pa. Code §63.64 (Records to be kept by employer), form the basis of an assessment.   Section 63.52 mandates a business, even if not an employer under the UC Law, file reports regarding payments to workers, including "the total amount of wages paid during the calendar quarter, the amount of wages paid during the calendar quarter … the amount of contributions due, and other information the Department requires."  34 Pa. Code §64.52(c).  Section 63.64 requires an employer to maintain certain records related to employees and wages for four years.  34 Pa. Code §63.64.

[8] Because the Department made a finding that the 12-14 Email was sent by Employer in mid-December 2017, it is inaccurate for the Department to refer to Employer's submission of actual wage records as 'untimely,' particularly when they were due by the end of 2017, and Tax Agent sent an email acknowledging her receipt in the 12-27 Email, which complied with the stated deadline "by the end of 2017."  F.F. No. 30.

What is problematic here is that OUCTS used estimates despite access to and receipt of actual 2013 figures,[9] and then, without reason or reasonableness, calculated the Assessment using inflated gross wages without regard to actual figures it had for other tax years. Given the figures OUCTS used, which bore no resemblance to subsequent tax years, the Assessment was more akin to a fabrication than to an estimate evincing a belief of the amount of UC taxes due.

Despite Tax Agent receiving actual wage information for 2013 before the end of 2017, OUCTS proceeded with the Assessment in order to ensure that it was issued within the four-year statutory limitation. In proceeding with the Assessment, OUCTS sacrificed accuracy in favor of expediency.

We reject the Department's premise that the source of the Assessment was 2014-2016 records when there was a substantial and unexplained disparity between Tax Agent's calculations of UC liability for 2013 and subsequent years. From our careful review, the record contains no evidence to suggest the "estimated figures" were based on Employer's 2014 to 2016 records. Tax Agent did not answer direct questions regarding the source of the figures in the Assessment. The evidence shows the figures used to calculate 2013 UC tax liability, *i.e.*, gross wages, were not close to the figures available for 2014 or subsequent tax years. The numerical comparisons highlight this disconnect.

---

[9] Although it has the power to subpoena records under the UC Law, OUCTS did not utilize this power to ensure it had the records necessary to perform an accurate assessment. The Department claims that it relied on Employer's cooperation because it had been so responsive, so it expected to receive the records in sufficient time. Resp't's Br. at 16. This begs the question as to why OUCTS did not follow up to investigate the whereabouts of the TY 2013 records when not provided with the others requested and then submitted on December 14, 2017.

13

This Court agrees that OUCTS may estimate an assessment using figures from other tax years. Indeed, use of estimates when actual figures are not available is a typical and effective tool of government when discerning tax liability. *See generally Cedarbrook Realty, Inc.* (explaining purpose of assessment to obtain tax owed);[10] *see, e.g., Green v. Schuylkill Cty. Bd. of Assessment Appeals*, 772 A.2d 419 (Pa. 2001) (property tax context). The overreach we discern is the Department's intentional significant inflation of those estimates.

In contrast to typical estimates based on subsequent tax years or available records, the Assessment was not tethered to the belief of what taxes were due or other indicia of reasonability as required by Section 304(a) of the UC Law. There was a discrepancy of almost half a million dollars between the amount of gross wages OUCTS used and the actual wages paid in 2013. F.F. No. 44. Indeed, compared to the $825,000 gross wages OUCTS used in the Assessment, the Department found "[Employer] paid a total of $344,311.00 in gross wages, $200,149.00 of which were taxable … which remuneration should have been reported as wages on a UC tax return, resulting in a net tax adjustment of $20,645.61 and a total amount of $30,291.26 due from [Employer] as of January 31, 2018." *Id.* Since the interest continued to accrue on the unpaid tax balance, the balance due was $31,375.15 as of the end of August 2018, F.F. No. 45, compared to the almost $119,000 in UC tax liability stated in the Assessment. The Department offered no reason for using $825,000 gross wages to derive this Assessment.

___

[10] Our Supreme Court described an agency's assessment as having "the force of a judgment, and if the amount assessed is not paid when due, administrative officials may seize the debtor's property to satisfy the debt. … [Indeed] [t]he assessment supersedes the pleading, proof and judgment necessary in an action at law, and has the force of such a judgment." *Cedarbrook Realty, Inc. v. Nahill*, 399 A.2d 374, 378 (Pa. 1979).

14

In its brief, the Department admits repeatedly to its knowing inflation and attempts to justify it, without any legal authority in support. The Department explained it did not merely estimate using other tax years for Employer's UC liability, which would have been reasonable and legally supportable; rather, it describes its approach as follows: "OUCTS based the estimates on information that [Employer] provided regarding the next three tax years (Agency [Dec.] [at] 7-8, [F.F.] [No.] 33), **and increased the figures** to preserve OUCTS' ability to collect taxes owed by JDM." Resp't's Br. at 13 (emphasis added). It continues: "OUCTS **inflated** the estimated figures to preserve its statutory authority and responsibility to pursue tax collection," *id.* (emphasis added), but that duty is limited to responsible tax collection of amounts due the government, not more. This Court is unaware of any authority permitting a tax collection entity to artificially inflate tax liability and issue an assessment for the inflated amount, and the Department cites none.

Pursuant to Section 304(a) of the UC Law, OUCTS is not required to be accurate, but it is required to have a belief, based on available information, as to tax liability, and issue an assessment consistent with that belief. The Department here ignores the material distinction between a capricious amount assessed and a reasonable estimate based on the available information.

OUCTS' approach here expands a taxing authority's power from its proper confines of collecting what is owed to collecting more than what is owed, knowingly and deliberately. Upholding this exercise of assessment authority under Section 304 of the UC Law without constraints of reasonableness divorces an assessment from its purpose of obtaining taxes due.

15

We also discern no merit in the Department's contention that the reassessment process adequately protects Employer from OUCTS' overreach. OUCTS' deliberate attempt to collect almost $90,000 more than the amount "believed" due was not in accordance with Section 304, and may not go unchecked. *Slawek*. In our estimation, OUCTS' conduct is tantamount to "a purely arbitrary execution of the agency's duties or functions." *Id.* at 364 (quoting *Blumenschein v. Hous. Auth. of Pittsburgh*, 109 A.2d 331, 334-35 (Pa. 1954)). Accordingly, voiding the Assessment is an appropriate remedy tailored to these circumstances.

In sum, in upholding the Assessment, the Department erred. Because inflating figures underlying an assessment is not a necessarily implied power under Section 304 of the UC Law, OUCTS exceeded its statutory authority. Accordingly, we reverse the Department's order and void the Assessment.

### 2. Statutory Limitations Period in Section 309.2[11]

Voiding the Assessment as opposed to permitting its late recalculation is also consistent with Section 309.2 of the UC Law, 43 P.S. §789.2, which limits enforcement to assessments instituted within a four-year look back period.

Prior to its amendment in 2016, Section 309.2 of the UC Law, "Limitations upon enforcement of payment of contributions, interest and penalties," read, in pertinent part:

---

[11] Although both parties refer to Section 309.2 as a "statute of limitations," it is not a statute of limitations under the Judicial Code, 42 Pa. C.S. §§5521-5538, setting the period within which civil actions may be filed. Rather, it is a statutory limitations period that applies to the assessment process only. *See In re Condemn. by Dep't of Transp., of Right-of-Way for State Route 0095, Section BSR*, 131 A.3d 625 (Pa. Cmwlth. 2015) (distinguishing the two types of statutes).

16

(a) Notwithstanding any other provisions of this act to the contrary, <u>no legal action for the collection of contributions, interest and penalties shall be instituted after the expiration of four years</u> from the end of the calendar year determined in accordance with subsection (b) of this section, <u>unless prior to the expiration</u> of such four-year period and with respect thereto (1) <u>an assessment proceeding shall have been instituted</u> <u>pursuant to the provisions of [S]ection [304] of this act</u> …

(b) The calendar year referenced in subsection (a) of this section shall be the later of the following calendar years: (1) the <u>calendar year in which the wages were paid with respect to which liability for the payment of contributions, interest or penalties, as the case may be, is based</u> …

43 P.S. §789.2 (emphasis added). Section 309.2 was amended in 2016,[12] specifying it "shall apply to contributions on wages paid on or after January 1, 2017." Because the contributions at issue are for wages paid in 2013, OUCTS was required to "institute" an assessment by <u>December 31, 2017</u>. *Id.*; *see* F.F. No. 30 ("Any assessment for the year 2013 had to be issued by the end of 2017.").

The word "instituted" is not defined in the UC Law or regulations. Thus, we may consult a dictionary for its common usage. *Summit Sch., Inc.* The meaning of the term "institute" in this context is "initiate or start." WEBSTER'S NEW WORLD DICTIONARY, 351 (1985). Based on the unambiguous statutory language, OUCTS instituted the Assessment in 2017, and so was enabled to collect the amount of that Assessment if not appealed.

The Assessment itself stated that it became binding and conclusive within 15 days. R.R. at 16a. Just as a trial court is not permitted to amend an order after the 30-day appeal period lapses, *see* 42 Pa. C.S. §5505, OUCTS was not

---

[12] *See* Act of November 3, 2016, P.L. 1100 (increasing four-year look back period to six years).

permitted to 'amend' its assessment after the 15-day period. Regardless, we discern no basis for allowing OUCTS to reopen the Assessment here appealed from, which, while timely, was issued without statutory authority.

The statutory language is clear regarding when OUCTS must institute collection. In this case, OUCTS admittedly did not base its assessment of Employer's tax liability on actual records until 2018. Tax Agent issued the Assessment before completing the Audit and sending her findings to Employer. N.T. at 56. This is despite Tax Agent's *acknowledged receipt* of the records on December 27, 2017, "before the end of 2017," the deadline she set. F.F. No. 21.

We are likewise unpersuaded by the Department that the Assessment may be substantively changed in the "Exit Letter" that OUCTS issued in 2018. As an explanation of the findings of the Audit, the Exit Letter is not the same as the Assessment. The Exit Letter did not trigger an appeal period and is not mentioned in the statutory four-year limitations period in Section 309.2 or in Section 304(a).

In the tax collection process, an assessment is a means of obtaining taxes owed, and thus has "the force of a judgment" to collect the amount due. *Cedarbrook Realty, Inc.*, 399 A.2d at 377. In issuing the Assessment as no more than a placeholder to preserve its collection flexibility, the Department contravened the intent of the statute to collect monies on behalf of the government.

To allow recalculation of the Assessment to reflect actual gross wages paid in 2013, so OUCTS may collect the UC tax owed *after* the four-year limitations period, would undermine the plain language of Section 309.2 of the UC Law which

18

imposes a finite window within which the Department may collect allegedly overdue UC contributions. While the Assessment instituted in 2017 was timely, it was invalid. The Department acknowledged it rushed the Assessment knowing that it had the "one shot" at collection. N.T. at 51. Allowing recalculation here would permit another shot, essentially condoning OUCTS' overreach of authority. Therefore, for this additional reason, we conclude the Assessment may not be recalculated. Further, the Assessment is also the only subject of this appeal; to the extent OUCTS indicated its intent to issue an assessment in 2018 to correct the one under review, that is beyond our purview on appeal.[13]

## B. Due Process Challenge

Employer also argued the Assessment violated his due process rights. As any lack of regularity in agency process is remedied by voiding the Assessment, we need not address Employer's due process challenge.

## C. Estoppel

Because the Assessment is void and unenforceable, it is unnecessary to estop its enforcement. As such, we do not consider Employer's estoppel claim.[14]

---

[13] Moreover, any assessment in 2018 to collect UC taxes from Employer for TY 2013 would be untimely under Section 309.2 of the UC Law, 43 P.S. §789.2, and unenforceable on that basis.

[14] To apply the doctrine of equitable estoppel to a Commonwealth agency, the agency must have: (1) intentionally or negligently misrepresented some material facts; (2) known or had reason to know that the other party would justifiably rely on the misrepresentation; and (3) induced the party to act to his detriment based on justifiable reliance on the misrepresented facts. *See Foster v. Westmoreland Cas. Co.*, 604 A.2d 1131 (Pa. Cmwlth. 1992). To the extent the Assessment misrepresented the UC tax due, Employer did not identify any reliance on its accuracy to his detriment. Had Employer relied on the amount due as stated in the Assessment, and not filed a petition for reassessment, then he could have had a viable estoppel claim.

### III. Conclusion

OUCTS did not perform the Assessment in accordance with its statutory authority, using inflated figures that bore no reasonable resemblance to the other years for which Tax Agent had all requested records, or to the actual figures submitted for TY 2013. For these and the foregoing reasons, this Court reverses the Department's order and holds the Assessment void and unenforceable.

_____
J. ANDREW CROMPTON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Julian Mihaita, d/b/a : 
JDM Industrial Painting, a/k/a : 
JDM Industrial and Commercial : 
Painting, : 
                  Petitioners : 
                   : 
            v. : No. 1264 C.D. 2019
                   : 
Department of Labor and Industry, : 
Office of Unemployment Compensation : 
Tax Services, : 
          Respondent : 

# **O R D E R**

      **AND NOW**, this 26th day of June 2020, the order of the Department of Labor & Industry is REVERSED and the Office of Unemployment Compensation (UC) Tax Services' ASSESSMENT as to Julian Mihaita's UC tax liability for Tax Year 2013 is VOID and UNENFORCEABLE.

                               _____

                               J. ANDREW CROMPTON, Judge